Case 19-21560-GLT    Doc 471    Filed 03/16/22    Entered 03/16/22 12:36:15    Desc Main
Document    Page 1 of 20

FILED
3/16/22 12:02 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: : | Case No. 19-21560-GLT |
| **PIUS STREET ASSOCIATES, LP,** : | Chapter 7 |
| *Debtor.* : | |
| : | |
| **ANGEL ARMS CONDOMINIUM ASSOCIATION**, : | |
| *Movant,* : | Related to Dkt. Nos. 332, 336, 345 |
| : | 346, 347, 357, 358, 359 |
| v. : | |
| **THOMAS TRIPOLI**, : | |
| *Respondent.* : | |

Nicholas A. Miller, Esq.   Jeffrey T. Morris, Esq.
Herron Business Law        Elliot & Davis, PC
Pittsburgh, PA             Pittsburgh, PA
*Attorney for the Association*   *Attorney for Tripoli*

## MEMORANDUM OPINION

Once God's house, the former St. Michael's Church on Pittsburgh's South Side Slopes is now the 26-unit Angel Arms Condominium complex. In the absence of any higher power, there is a dispute over who holds the worldly authority to license the condominium's amenities, such as parking and storage. For roughly ten years, the debtor-developer Pius Street Associates, LP ("Debtor") did just that and kept the licensing fees it collected. But the Angel Arms Condominium Association ("Association") asserts the Debtor converted those fees by usurping the Association's dominion over condominium property.[1] Thomas Tripoli, the Debtor's limited

---

[1] See *Amended Claim No. 5-3*.

partner and the sole shareholder of its general partner, objects to the Association's claim to both past and future licensing fees, contending that they are subject to the Debtor's reserved rights in the condominium's formation documents.[2] This discrete issue is presently before Court on cross-motions for summary judgment.[3] For the reasons below, the Court finds that only the Association is entitled to partial summary judgment, though on a more narrow basis than it urges.

I.  BACKGROUND

The salient facts are undisputed. The condominium build out began in 2002.[4] In July 2003, the Debtor recorded a declaration of condominium (as amended, the "Declaration") in accordance with the Pennsylvania Uniform Condominium Act[5] ("Condominium Act") formally creating the Angel Arms Condominium ("Angel Arms").[6] The Declaration provides that the individual parking spaces in the covered garage and outdoor parking decks, the rooftop decks, certain storage areas, and the wine cellar are all "limited common elements" that may be created in the condominium and licensed to unit owners.[7] Until licensed, however, these "licensable elements"—a descriptor used by the Court for clarity—are expressly "common elements"[8] and not "limited common elements."[9] As explained in greater detail below, the difference pertains to the

---

[2]  See Objection to Claim, Dkt. No. 183.

[3]  See Motion for Partial Summary Judgment, Dkt. No. 332; Cross Motion for Partial Summary Judgment, Dkt. No. 345.

[4]  Concise Statement of Facts in Support of Motion for Partial Summary Judgment ("Statement of Facts"), Dkt. No. 332-1 at ¶ 1; Tripoli Response to AACA Concise Statement of Material Facts ("Responsive Statement"), Dkt. No. 347 at ¶ 1.

[5]  See 68 Pa. Stat. and Cons. Stat. Ann. § 3101 et seq.

[6]  Statement of Facts, Dkt. No. 332-1 at ¶¶ 2, 7-8; Responsive Statement, Dkt. No. 347 at ¶¶ 2, 7-8.

[7]  See Declaration of Condominium Angel Arms Condominium, Dkt. No. 332-4 at § 1.2.2.11.

[8]  Under the Declaration, "Common Areas" and "Common Elements" are interchangeable terms. Id. at §1.2.2.4.

[9]  Id. at §§ 3.1.5-8, 3.2.1, 6, 9-10, 14.

exclusivity with which the use and financial burden of these elements are allocated. Notably, however, the Declaration prohibits unit owners and other occupants from using parking spaces that are not specifically licensed to them.[10]

Despite the implicit need to license, there is no express grant of licensing power in the Declaration. That said, the Association is governed by its executive board,[11] which was initially controlled by the Debtor-declarant until a requisite number of units were conveyed.[12] The Declaration explicitly vests the executive board with

> all authority to manage, repair, replace, alter and improve the Common Areas and assess and collect funds for the payment thereof, and to all things, and exercise all rights provided by the Condominium organizational documents, or the [Condominium] Act, that are not specifically reserved to Unit Owners.[13]

But the right to legally enforce "all restrictions, conditions, covenants, reservations, liens and charges set forth" in the Declaration or the Association's rules is separately granted to the declarant, the Association, and each unit owner.[14] Moreover, the inaction of any of those parties "shall in no event be deemed a waiver of the right to enforce at a later date the original violation or a subsequent violation."[15]

In accordance with Condominium Act,[16] the Debtor prepared a Public Offering Statement ("Offering Statement") that discloses certain required information about the property to

---

[10] Id. at § 8.1.19.
[11] Id. at § 13.4.
[12] Id. at § 13.6.
[13] Id. at § 13.5.
[14] Id. at § 8.3.
[15] Id.
[16] See 68 Pa. Stat. and Cons. Stat. Ann. § 3402.

3

prospective unit buyers.[17] Among the disclosures was a statement that the "Unit Owners will pay license fees for parking spaces, outdoor terraces, storage spaces and wine cellars, as selected by the Unit Owner."[18] The Offering Statement, however, does not specifically identify to whom such fees would be paid. Indeed, it only explains that "[t]he [Debtor as] Declarant will decide what to do with any parking spaces which remain unlicensed prior to the expiration of Declarant Control, as defined in the Declaration."[19]

Even so, it is undisputed that between February 10, 2005 and July 28, 2015, the Debtor entered into over a dozen agreements by which it licensed various licensable elements to unit owners (including members of the Tripoli family), and retained all licensing fees.[20] The Debtor executed two of the license agreements after it was compelled to cede control of the Association to the individual unit owners pursuant to a court order.[21] The details of those licenses are as follows:

| Date | Licensed Elements | Fee Paid |
|---|---|---|
| 2/10/2005 | 1 undercover parking space | $20,000 |
| 10/1/2005 | 1 parking deck space | $5,000 |
| 2/20/2009 | 1 small garage parking space<br>1 parking deck space<br>1 (large) storage unit | $22,000<br>$10,000<br>$8,000 |
| 9/15/2009 | 2 undercover parking spaces<br>1 parking deck space<br>1 storage area | Included in Sale Price |
| 12/18/2009 | 1 undercover parking space<br>1 (small) storage locker | $20,000<br>$4,500 |

---

[17] See *Angels [sic] Arms Condominium Public Offering Statement*, Dkt. No. 345-2.

[18] Id. at 23.

[19] Id. at 7.

[20] *Statement of Facts*, Dkt. No. 332-1 at ¶¶ 13-25; *Responsive Statement*, Dkt. No. 347 at ¶¶ 13-25; see also Exs. 3-13, Dkt. No. 332-3.

[21] See *Motion to Convert Case to Chapter 7 or, alternatively, to Appoint a Chapter 11 Trustee filed by Angel Arms Condominium Association*, Dkt. No. 118 at ¶ 46; *Response and Objection to Motion to Convert or, Alternatively Appoint a Chapter 11 Trustee filed by Thomas Tripoli*, Dkt. No. 123 at ¶ 2. Though undisputed, this fact is not contained within the summary judgment record. Therefore, it is offered only for context and is not dispositive of the issues now before the Court.

4

|  | 1 roof deck | $10,000 |
|---|---|---|
| 2/4/2010 | 2 undercover parking spaces<br>1 parking deck space<br>12 storage lockers<br>The entire wine cellar | Included in Sale Price |
| 12/30/2011 | 1 storage locker | $8,000 |
| Unknown[22] | 1 undercover parking space | $6,000 |
| 6/4/2013 | 1 small parking garage space<br>1 parking deck space | $25,000<br>$18,500 |
| 11/14/2014 | 1 undercover parking space<br>1 parking deck space | $17,500 |
| 7/28/2015 | 2 undercover parking spaces<br>1 parking deck space<br>1 storage area | Included in Sale Price |
| 7/28/2015 | 2 undercover parking spaces<br>1 parking deck space | Included in Sale Price |
| Unknown[23] | 3 undercover parking spaces<br>1 storage area<br>1 wine cellar (transferred from A-3) | Included in Sale Price |

In each license agreement, the Debtor purports to license in its own right as the declarant of Angel Arms, noting that "under the Declaration . . ., certain common areas are to be created in the Condominium by Declarant," and that "Licensor has agreed to designate some of the parking areas roof decks, wine cellar and storage areas as Limited Common Areas. . . ."[24] For the record, the parties agree that the Association did not authorize the Debtor to act as a licensing agent, though Tripoli insists that is irrelevant because the Debtor reserved the right to do so in the condominium documents.[25]

Each license agreement also states that "*upon the transfer of the Common Areas to the [] Association*, including the Limited Common Areas, this License Agreement will be assigned

---

[22]  Although the transaction is not disputed, the licensing agreement is not included in the record and the no date is listed.  See *Statement of Facts*, Dkt. No. 332-1 at ¶ 20; *Responsive Statement*, Dkt. No. 347 at ¶ 20.

[23]  Although the transaction is not disputed, the licensing agreement is not included in the record and the no date is listed.  See *Statement of Facts*, Dkt. No. 332-1 at ¶ 25; *Responsive Statement*, Dkt. No. 347 at ¶ 25.

[24]  See, e.g., *Ex. 8*, Dkt. No. 332-4 at 1.

[25]  *Statement of Facts*, Dkt. No. 332-1 at ¶ 12; *Responsive Statement*, Dkt. No. 347 at ¶ 12.

to the Association."[26] In other words, this language suggests a period during which the declarant holds the common elements, not the Association or unit owners. Although there is unquestionably a period of declarant control before the Association and its executive board gain independence,[27] the Declaration unequivocally provides that the unit owners are each allocated an undivided interest in the common elements.[28]

On April 17, 2019, the Debtor filed a voluntary chapter 11 petition, but the Court later converted the case to chapter 7.[29] The Association filed a secured proof of claim in the amount of $3,063,795.72, inclusive of approximately $825,000 related to the allegedly converted licensing fees.[30] In response, Tripoli objected to the proof of claim.[31] The Association then moved for partial summary judgment on the discrete issue as to whether the Debtor had the legal authority to license the Limited Common Elements and retain the proceeds,[32] prompting Tripoli to file a cross-motion for partial summary judgment.[33] After a hearing on the matters, the Court took the cross-motions under advisement.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States

---

[26]  See, e.g., Ex. 8, Dkt. No. 332-4 at 2 (emphasis added).

[27]  See Declaration of Condominium Angel Arms Condominium, Dkt. No. 332-4 at § 13.6.

[28]  Id. at §§ 2.1.1, 3.3.

[29]  Order Granting Motion to Convert Case from Chapter 11 to Chapter 7, Dkt. No. 167.

[30]  Amended Claim No. 5-3 at 4.

[31]  Objection to Claim, Dkt. No. 183.

[32]  Motion for Partial Summary Judgment, Dkt. No. 332.

[33]  Cross Motion for Partial Summary Judgment, Dkt. No. 345.

District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### III.  POSITIONS OF THE PARTIES

#### A.  The Association

The Association asserts that nothing in the Declaration explicitly reserves in the Debtor the power to license Limited Common Elements or retain the licensing fees.[34] The Association argues that the Debtor cannot assert any "special declarant right" to retain the licensing fees because Pennsylvania courts have determined that "each additional declarant right must be specifically stated within the declaration of condominium."[35] Instead, the Association maintains that the right to license Limited Common Elements rests solely with the Association because the Declaration provides it with the obligation to "budget, maintain, and repair the Common Elements and Limited Common Elements."[36] Finally, the Association contends that the Offering Statement, the only document which seemingly suggests that the Debtor has any discretion over the parking spaces, is a non-dispositive "marketing piece" that the Court should disregard.[37]

#### B.  Tripoli

Tripoli argues that "the Declaration . . . and the [Offering Statement] narrative clearly provide that the Declarant contemplated and reserved the right to license parking spaces and other Limited Common Elements to Unit Owners for a fee and fully disclosed same to

---

[34] *Movant's Brief in Support of Motion for Partial Summary Judgment*, Dkt. No. 336 at 4.

[35] Id. at 3.

[36] Id. at 4.

[37] *Movant's Sur-Reply Brief in Support of Motion for Partial Summary Judgment and in Opposition to Thomas Tripoli's Cross Motion for Partial Summary Judgment*, Dkt. No. 357 at 4.

prospective condominium unit purchasers."[38] Frustratingly, he does not acknowledge that the Declaration lacks an explicit reservation of rights. Instead, Tripoli points to all the passive language throughout the Declaration that envisions the licensing of Limited Common Elements as if it expressly says the Debtor (as declarant) can create, designate, and license.[39] At any rate, he contends that a reservation of rights in favor of the Debtor is implicit in these passages and is supported by the Offering Statement which provides that "[t]he Declarant will decide what to do with any parking spaces which remain unlicensed prior to the expiration of Declarant Control, as defined in the Declaration."[40] In support, Tripoli relies on two cases, *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P.*[41] and *Gior G.P., Inc. v. Waterfront Square Reef*,[42] for the proposition that nothing in the Condominium Act bars real estate developers from retaining indefinite control and exclusive use of a limited common elements.

Alternatively, Tripoli asserts that the Court should be persuaded by the "roughly 10 years in which parking spaces and other limited common elements were licensed by the Debtor to individual unit owners in exchange for consideration."[43] He argues that "[s]uch course of dealing evidence is strong and persuasive evidence of the parties['] mutual understanding that such licensing by the Debtor as Declarant was contemplated, permitted and assented to, even if

---

[38]  *Brief in Support of Tripoli Cross-Motion for Partial Summary Judgment and in Opposition to AACA Motion for Partial Summary Judgment*, Dkt. No. 346 at 6.

[39]  See Id. at 6-9.

[40]  Id.

[41]  MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P., 2012 PA Super 122, 47 A.3d 137 (2012).

[42]  Gior G.P., Inc. v. Waterfront Square Reef, LLC, 202 A.3d 845 (Pa. Commw. Ct.), reargument denied (Mar. 6, 2019), appeal denied, 217 A.3d 1216 (Pa. 2019).

[43]  *Brief in Support of Tripoli Cross-Motion for Partial Summary Judgment and in Opposition to AACA Motion for Partial Summary Judgment*, Dkt. No. 346 at 10.

8

arguendo the Declaration as amended made no reference to licensing of limited common elements."[44]

## IV. DISCUSSION

### A. The Summary Judgment Standard

Summary judgment is appropriate when a moving party shows that no genuine issue as to any material fact exists and that the moving party is entitled to a judgment as a matter of law.[45] "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable [trier of fact] could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law."[46] The party seeking summary judgment carries the burden of showing that the evidentiary record presents no genuine issue of material fact.[47] To avoid summary judgment, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof."[48] Reviewing the record as a whole, the Court is to "draw all reasonable inferences in favor of the non-moving party and will not weigh the evidence or make credibility determinations."[49] The same standards apply when the court is confronted by cross-motions for summary judgment.[50]

---

[44] Id.

[45] FED. R. CIV. P. 56(a); Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015).

[46] Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

[47] Willis, 808 F.3d at 643.

[48] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[49] Parkell v. Danberg, 833 F.3d 313, 323 (3d Cir. 2016) (quoting Amour v. Cty. of Beaver, Pa, 271 F.3d 417, 420 (3d Cir. 2001)).

[50] Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987).

B.     Analysis

The Court's analysis starts with the most basic question—*what is a condominium?* Under Pennsylvania law, a "condominium" is real estate consisting of "portions . . . which are designated for separate ownership" with "the remainder . . . designated for common ownership solely by the owners of those portions."[51]  The portions designated for separate ownership are "units,"[52] while the commonly owned portions are called "common elements."[53]  The defining characteristic of a condominium is that the undivided interests in the common elements are vested in the unit owners.[54]  Some common elements may be allocated for the exclusive use of fewer than all units, rendering them "limited common elements."[55]  Limited common elements are therefore a subset of common elements legally distinguished to ensure unit owners who are not entitled to enjoy such amenities are not saddled with the financial burden of maintaining them.[56]

All condominiums created within the Commonwealth are subject to the Condominium Act,[57] which is modeled on the Uniform Condominium Act drafted by the Uniform Law Commission (the "Uniform Law").[58]  Given the inherent complexity attendant to carving up real estate into separately and commonly owned parts, the Condominium Act imposes certain substantive requirements and establishes a baseline set of rules governing their creation and

---

[51]   68 Pa. Stat. and Cons. Stat. Ann. § 3103 ("Condominium").

[52]   Id. ("Unit").

[53]   Id. ("Common elements").

[54]   Id. ("Condominium." . . . Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners."); see also 68 Pa. Stat. and Cons. Stat. Ann. § 3208 (allocation of common element interests).

[55]   Id. ("Limited common element").

[56]   See 1 Law of Condominium Operations § 1:2.

[57]   68 Pa. Stat. and Cons. Stat. Ann. § 3102.

[58]   68 Pa. Stat. and Cons. Stat. Ann. § 3102, Pennsylvania Cmt. – 1978, ("Technical changes were required by the renumbering of certain sections, by the omission of Article 5 and by conforming the act to Pennsylvania practice.").

10

operation.[59] Though condominiums are not technically creatures of contract, such principles are often applied to them.[60] Thus, the statute balances contractual flexibility with the need to protect purchasers, lenders, and declarants by clearly establishing the rights and obligations of each party.[61] In fact, consumer protection was one of the motivating principles behind the Uniform Condominium Act.[62]

Under the Condominium Act, a condominium can only be created by a "declarant"[63] who "record[s] a declaration executed, in the same manner as a deed, by all persons whose interests in the real estate will be conveyed to unit owners."[64] The declaration is "the perpetual governing instrument for the condominium."[65] The statutorily required contents of a declaration generally involve matters pertaining to the legal structure of the condominium or its title.[66] For example, the declaration must use the word "condominium" in the project's name, contain a legally sufficient description of the real estate included in the condominium, delineate the boundaries of each unit, and list any use or occupancy restrictions imposed by the declarant.[67]

---

[59] See 68 Pa. Stat. and Cons. Stat. Ann. § 3104 ("Except as expressly provided in this subpart, provisions of this subpart may not be varied by agreement and rights conferred by this subpart may not be waived. A declarant may not act under a power of attorney or use any other device to evade the limitations or prohibitions of this subpart or the declaration.").

[60] See MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P., 47 A.3d at 145 (citing Country Classics at Morgan Hill Homeowners' Association, Inc. v. Country Classics at Morgan Hill, LLC, 780 F.Supp.2d 367, 374 (E.D. Pa.2011)).

[61] 68 Pa. Stat. and Cons. Stat. Ann. § 3104, Unif. Law Cmt. 1.

[62] See 1 Law of Condominium Operations § 1:11.

[63] 68 Pa. Stat. and Cons. Stat. Ann. § 3103 ("Declarant").

[64] 68 Pa. Stat. and Cons. Stat. Ann. § 3201.

[65] 68 Pa. Stat. and Cons. Stat. Ann. § 3219, Unif. Law Cmt. 1.

[66] 68 Pa. Stat. and Cons. Stat. Ann. § 3205; see also 68 Pa. Stat. and Cons. Stat. Ann. § 3205, Unif. Law Cmt. 1.

[67] See 68 Pa. Stat. and Cons. Stat. Ann. §§ 3205(1), (3), (4), (9).

11

In that vein, the Condominium Act also mandates that the declaration adequately describe several aspects of any limited common elements. After all, that characterization carries legal consequences for all unit owners in the condominium. First, the declaration must contain a description of any limited common elements.[68] Second, except for fixtures that are statutorily allocated to the unit they exclusively serve,[69] the declaration must specify "to which unit or units each limited common element is allocated."[70] Third, the declaration must disclose any limited common expenses—the liabilities associated with the upkeep of the limited common elements[71]—and how they will be assessed.[72] Fourth, "[a]ny fees or charges to be paid by unit owners, currently or in the future, for the use of . . . limited common elements" must be similarly included in the declaration.[73] Finally, if a common element may be later allocated to a unit owner as a limited common element, the declaration must contain a statement to that effect and describe "the method by which the allocations are to be made."[74]

The Condominium Act is largely silent on the effect of any failure to include a required term in the declaration. For example, legislative commentary suggests a declarant may be subject to personal liability for the failure to include the recording data for any easements and licenses included in the condominium or to which condominium property is subject.[75] Beyond

---

[68] 68 Pa. Stat. and Cons. Stat. Ann. § 3205(6).

[69] 68 Pa. Stat. and Cons. Stat. Ann. § 3202(2), (4).

[70] 68 Pa. Stat. and Cons. Stat. Ann. § 3209(a).

[71] 68 Pa. Stat. and Cons. Stat. Ann. § 3103 ("Limited common expenses").

[72] 68 Pa. Stat. and Cons. Stat. Ann. § 3205(6); see also 68 Pa. Stat. and Cons. Stat. Ann. § 3314(c) (governing special allocations of expenses).

[73] 68 Pa. Stat. and Cons. Stat. Ann. § 3205(13.2). The Court acknowledges that this provision of the Condominium Act was added in 2020, after the Declaration in this case was recorded.

[74] 68 Pa. Stat. and Cons. Stat. Ann. § 3205(7); see also 68 Pa. Stat. and Cons. Stat. Ann. § 3209(c) (common elements not previously allocated).

[75] 68 Pa. Stat. and Cons. Stat. Ann. § 3205, Pennsylvania Cmt. – 1978.

that, the Court is mindful that "Pennsylvania courts have examined condominium declarations under the umbrella of general contract law,"[76] and that "principles of law and equity" apply unless inconsistent with the provisions of the Condominium Act.[77] Thus, consonant with the premise of consumer protection, the Court concludes that omissions and ambiguities are to be construed against the declarant as the drafter of the declaration.[78]

To serve the fundamental communal interests, the Condominium Act commands the establishment of a unit owners' association by the time the first unit is conveyed to someone other than the declarant.[79] "Subject to the provisions of the declaration," the Condominium Act empowers an association to do essentially all the things necessary to operate and manage the condominium for the benefit of the unit owners.[80] This includes the obvious universe of functions such as adopting bylaws and regulations, creating a budget for revenues and expenditures, and hiring employees and contractors.[81] As for common elements, an association may also:

> (6) Regulate the use, maintenance, repair, replacement and modification of common elements . . .
>
> * * *
>
> (9) Grant easements, leases, *licenses* and concessions through or over the common elements . . . [and]

---

[76] Country Classics at Morgan Hill Homeowners' Association, Inc. v. Country Classics at Morgan Hill, LLC, 780 F.Supp.2d at 374,

[77] 68 Pa. Stat. and Cons. Stat. Ann. § 3108.

[78] See Wert v. Manorcare of Carlisle PA, LLC, 633 Pa. 260, 279, 124 A.3d 1248, 1260 (2015) (citing Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 559 Pa. 56, 67, 739 A.2d 133, 139 (1999)); Huss v. Weaver, 2016 PA Super 24, 134 A.3d 449, 456 n.2 (2016).

[79] 68 Pa. Stat. and Cons. Stat. Ann. § 3301.

[80] 68 Pa. Stat. and Cons. Stat. Ann. § 3302(a).

[81] Id.

13

(10) Impose and receive any payments, fees or charges for the use, rental or operation of the common elements other than limited common elements described in section 3202(2) and (4) (relating to unit boundaries).[82]

That said, an association's power to license common elements in a manner that does not "benefit . . . all or substantially all of the unit owners" is statutorily conditioned on obtaining the requisite approval from the unit owners.[83] Notably, the executive board, which acts on behalf of a unit owners' association,[84] may unilaterally implement certain curative amendments to the declaration to resolve ambiguities, correct defects, or supplement missing provisions.[85]

But nearly everything the statute giveth, the declaration may taketh away. Recall that the powers of an association are "[s]ubject to the provisions of the declaration."[86] In other words, the Condominium Act identifies powers that an association "may" possess by default.[87] Yet the declaration can restrict or condition the association from acting in a manner that is otherwise permissible under the statute. Of course, if any restrictions exist, the unit owners could vote (in accordance with the declaration and statute) to remove them at any time.[88]

A declarant may curb an association's power by reserving "special declarant rights" for its benefit.[89] Although the statutory definition identifies ten types of special declarant rights, the list is non-exhaustive. Rather, Pennsylvania courts recognize that an *explicit* reserved right to

---

[82] 68 Pa. Stat. and Cons. Stat. Ann. §§ 3302(a)(6), (9)-(10) (emphasis added).

[83] 68 Pa. Stat. and Cons. Stat. Ann. § 3302(a)(9)(i)-(ii); see also 68 Pa. Stat. and Cons. Stat. Ann. § 3219(a)(3)(ii)(D) (amendments relating to the reallocation of common elements as limited common elements by the unit owners' association does not require approval by 67% of the unit owners).

[84] 68 Pa. Stat. and Cons. Stat. Ann. § 3303(a).

[85] 68 Pa. Stat. and Cons. Stat. Ann. § 3219(f).

[86] 68 Pa. Stat. and Cons. Stat. Ann. § 3302(a).

[87] Id.

[88] 68 Pa. Stat. and Cons. Stat. Ann. § 3219(a).

[89] 68 Pa. Stat. and Cons. Stat. Ann. § 3103 ("Special declarant rights.").

license or allocate parking spaces contained within a declaration is a valid special declarant right and not against public policy.[90]

Special declarant rights must be reserved in the declaration. The drafters of the Condominium Act favored a decentralized approach over the Uniform Law's single blanket provision requiring a declaration to include "a description of any development rights and other special declarant rights . . . reserved by the declarant."[91] As a result, most of the special declarant rights listed in the definition are required to be set forth in the declaration by various provisions of the Condominium Act.[92] The others listed, such as the right to "[m]aintain offices, signs and models," are statutorily granted to the declarant by default.[93] Technically, the Condominium Act's focus on the enumerated rights means there is no express requirement that other special declarant rights be described in the declaration, but one is obviously implicit for many reasons.

To start, logic dictates that subjecting the declaration to undisclosed reserved rights undermines its role as the governing instrument of the condominium. It would also fail to protect the interests of a majority of the Condominium Act's constituencies; namely, prospective buyers, unit owners, associations, and lenders. As a matter of contract law, a provision omitted by the drafter-declarant could not be enforced against the unit owners or the association. And finally, to remove any remaining doubt, the Condominium Act itself requires *unanimous consent* of the unit

---

[90] See MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P., 47 A.3d at 145; Gior G.P., Inc. v. Waterfront Square Reef, LLC, 202 A.3d at 854-55.

[91] Unif.Condominium Act, § 2-105 (1980).

[92] See, e.g., 68 Pa. Stat. and Cons. Stat. Ann. §§ 3205(11)-(12), 3206-3207, 3211-3215, 3222.

[93] See, e.g., 68 Pa. Stat. and Cons. Stat. Ann. §§ 3217 (Declarant's offices, models and signs), 3218 (Easement to facilitate completion, conversion and expansion).

15

owners for any amendment to the declaration "to create or increase special declarant rights,"[94] emphasizing the heightened scrutiny applied to a declarant's attempt to claw back rights.

Now equipped with an understanding of Condominium Act, the Court shifts its analysis to the Declaration.

The Declaration characterizes the licensable elements (such as parking spaces and storage areas) as either limited common elements or common elements depending on whether they are licensed to a unit owner.[95] As a result, the licensable elements were necessarily common elements when the Declaration was executed and recorded. And to be clear, there is no evidence in the record showing that the common elements were withheld from Angel Arms awaiting a separate transfer. Thus, the Declaration vested the common elements' undivided interests in the individual unit owners.[96] This point is significant because once the common elements were ceded to collective ownership, the Debtor's control over them was not absolute and was necessarily constrained by the Declaration no matter how many units it owned.[97]

Given that the licensable elements were not initially allocated as limited common elements, the statute requires the declaration to describe "the method by which the allocations are to be made."[98] While the Declaration leaves much to be desired, the method of allocating a common element as a limited common element is articulated clearly enough (albiet implicitly): ***by licensing***. It is, after all, the defining characteristic of a licensable limited common element.

---

[94] 68 Pa. Stat. and Cons. Stat. Ann. § 3219(d).

[95] Compare *Declaration of Condominium Angel Arms Condominium*, Dkt. No. 332-4 at § 3.1.5 with § 3.2.6.

[96] Id. at §§ 2.1.1, 3.3.

[97] Remember that even if the Debtor held sufficient control of the Association to bless any exercise of authority, the fact that it would have to act in accordance with the Declaration or formally amend it is itself a constraint.

[98] 68 Pa. Stat. and Cons. Stat. Ann. §§ 3205(7), 3209(c).

Under the Condominium Act, the default rule is that an association is empowered to "regulate the use . . . of" and "grant . . . *licenses* over . . . the common elements."[99] Here, the Declaration explicitly vests the Association's executive board with "all authority to . . . exercise all rights provided by the Condominium organizational documents, *or the Act*, that are not specifically reserved to Unit Owners."[100] As a result, both the statute and the Declaration require a *specific reservation* of rights to prohibit the Association's executive board from exercising its statutory powers. Upon a thorough review of the Declaration, the Court finds no express restriction on the Association's authority to license common elements.

Tripoli's insistence that the Debtor reserved special declarant rights to license common elements and keep the licensing fees is unsupported by any evidence. Critically, he does not (and indeed cannot) identify an explicit reservation of these rights because there is no such provision. Frankly, all Tripoli does is point to the Declaration provisions relating to limited common elements and assert that the Offering Statement's narrative explains that "[t]he Declarant will decide what to do with any parking spaces which remain unlicensed prior to the expiration of Declarant Control."[101] But the Offering Statement is not a governing instrument that can create rights, and nothing in the Declaration supports, or even suggests, that the Debtor retained any control over the common elements. The Offering Statement also falls far short of making Tripoli's case as it references only a single type of licensable common element (parking) and on its face appears tied to the period of Declarant control. And all of this ignores the much bigger problem: even if a reserved right to license could be implied, it does not translate to the Debtor having a right to retain the licensing fees—*a concept absent from the Declaration*.

---

[99] 68 Pa. Stat. and Cons. Stat. Ann. §§ 3302(a)(6), (9) (emphasis added).

[100] *Declaration of Condominium Angel Arms Condominium*, Dkt. No. 332-4 at § 13.5 (emphasis added).

[101] *Angels [sic] Arms Condominium Public Offering Statement*, Dkt. No. 345-2 at 7 (emphasis added).

17

Ultimately, Tripoli's course of dealing argument fairs no better. Though he posits that the Debtor's ten years of licensing limited common elements while retaining the fees strongly evidences that this conduct was "contemplated, permitted and assented-to,"[102] this theory is foreclosed by the Declaration. It provides that the failure by the Association or any unit owner to enforce the Declaration's terms "shall in no event be deemed a waiver of the right to enforce [it] at a later date . . . ."[103] Put simply, prior inaction cannot shield the Debtor's licensing activities from proper scrutiny now.

Based on this analysis of the Condominium Act and the Declaration, the Court finds that: (1) the Debtor did not reserve any special declarant rights regarding the disposition of the licensable elements; (2) the Association is statutorily authorized to license common elements to unit owners in accordance with the Declaration; (3) the Debtor lacked authority in its own right to enter into license agreements with unit owners for the licensable elements; and (4) the Debtor lacked a legitimate basis to collect and retain licensing fees related to the limited common elements. But herein lies the rub: just because the Debtor was not entitled to collect the licensing fees, it does not follow that the funds are owed to the Association. In fact, the Association's claim to the licensing fees collected by the Debtor appears to be subject to genuine issues of material fact and law that the parties have likely not considered. To facilitate the future resolution of these matters, the Court will briefly touch upon the issues it has identified, mindful that there may be others that it has not.

First and foremost, it seems the Association has not considered the full implications of the position it has strenuously advanced. To put a finer point on it—are the license agreements

---

[102] *Brief in Support of Tripoli Cross-Motion for Partial Summary Judgment and in Opposition to AACA Motion for Partial Summary Judgment*, Dkt. No. 346 at 10.

[103] *Declaration of Condominium Angel Arms Condominium*, Dkt. No. 332-4 at § 8.3.

valid if the Debtor lacked authority in its own right to enter into them? On the one hand, the Debtor as declarant had control of the Association and its executive board at one time, which theoretically could have granted the licenses. But the Debtor did not purport to act on behalf the Association, and the record does not reveal whether the Debtor complied with the Declaration in granting those licenses. And, of course, that still would not address the license agreements the Debtor executed after the period of declarant control ended. The Association might have obtained the requisite approval of the unit owners to ratify the license agreements,[104] but that is not in the record either. Ultimately, if the license agreements are invalid and were not ratified by the Association, the *licensees* may lay claim to the fees the Debtor collected.

The second area of concern is that the Declaration does not contain the "fees or charges to be paid by unit owners . . . for the use of . . . limited common elements" as required by the Condominium Act.[105] Perhaps this is merely a technical problem, but it is not immediately clear what impact such a defect would have on the license agreements or any attempt by the Association to ratify them. This too may be an issue in which the licensees would be acutely interested. In any event, it is yet another reason why the Court is not prepared to find that the Association is entitled to the licensing fees the Debtor collected.

To be candid, the Court has struggled with these complex issues and is wary to move beyond the scope of what was presented without the benefit of further argument and a better record. More importantly though, there is enough factual uncertainty at play to dissuade the Court from even attempting to characterize any outstanding issues as "pure" questions of law. Instead,

---

[104]   See 68 Pa. Stat. and Cons. Stat. Ann. § 3302(a)(9)(i)-(ii).

[105]   See 68 Pa. Stat. and Cons. Stat. Ann. § 3205(13.2).

the Court will schedule further proceedings after affording the parties an opportunity to digest the Court's rulings and observations and formulate appropriate responses.

## V.    CONCLUSION

In light of the foregoing, the Court will grant the Association's motion in part, deny Tripoli's motion, and schedule this matter for further proceedings. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: March 16, 2022

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Nicholas A. Miller, Esq.
Jeffrey T. Morris, Esq.
Thomas Tripoli